

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

NO. 2-06-315-CV

ROBERTO DIAZ-ROHENA, M.D.                 APPELLANT

V.

CYNTHIA S. MELTON                     APPELLEE

------------

FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION ON REMAND[1]

------------

Appellant Roberto Diaz-Rohena, M.D. appeals the trial court's denial of his motion to dismiss with prejudice the health care liability claims of Appellee Cynthia S. Melton. We originally dismissed the appeal for want of jurisdiction. *Diaz-Rohena v. Melton*, 253 S.W.3d 290 (Tex. App.—Fort Worth 2007) (mem. op.), *rev'd*, 253 S.W.3d 218 (Tex. 2008). Because the Texas Supreme Court

---

[1] *See* TEX. R. APP. P. 47.4.

has instructed us that we do have jurisdiction, we now consider the appeal on the merits. *Diaz-Rohena*, 253 S.W.3d at 218.

In two issues, Dr. Diaz-Rohena argues that we should review the trial court's denial of his motion to dismiss under the de novo standard and that the trial court abused its discretion by denying his motion to dismiss. We affirm.

## Background

In her original petition, Melton alleges that Dr. Diaz-Rohena is an ophthalmologist who holds himself out as a specialist in the treatment and surgical repair of injuries and ailments related to the retina and vitreous. When Melton began to experience difficulty with her vision, her optometrist suspected a macular hole in her left eye as the cause and referred her to Dr. Diaz-Rohena. Dr. Diaz-Rohena diagnosed a Stage III macular hole, concluded that Melton was a good candidate for surgical repair, and recommended the same to her. In a preoperative meeting, Dr. Diaz-Rohena told Melton that her visual acuity prognosis was "good."

Dr. Diaz-Rohena performed surgery on Melton. His surgical notes state repeatedly that he encountered no complications at any stage of the procedure. But Melton alleges that his notes suggest problems with her left eye almost immediately following the procedure and that she suffered a major disruption of her vision within six weeks. Dr. Diaz-Rohena's notes indicate that her

2

problems may be associated with a gas bubble and pool of blood near the site of the surgery. His responsive plan was to continue to monitor Melton's condition in the hope of improvement.

Melton alleges that her left eye is now permanently impaired. She sued Dr. Diaz-Rohena for medical negligence and gross negligence, alleging various breaches of the applicable standards of care.

Melton eventually filed a report prepared by John M. Maggiano, M.D. Dr. Maggiano is a board certified ophthalmologist who practices in California. After reciting his qualifications, Dr. Maggiano set out the applicable standards of care, as follows:

> Surgical treatment of a macular hole includes removal of the vitreous jelly, identification and removal of a macular membrane, and exchange of the posterior fluid volume of the vitreous cavity with an air-gas mixture. During this procedure the surgeon has a duty to control the elements of the surgery to allow the surgery to safely proceed, without causing damage to the retina, macula or other structures of the eye.

> Surgery is appropriately performed by carefully approaching the macular portion of the retina through the vitreous cavity while holding instruments in both hands, while viewing and guiding the instrument tips inside of the vitreous via an operating room microscope and optical viewing system. The macular membrane is then carefully peeled from the retinal surface in a non-traumatic manner. A disclosing agent such as indocyanine green (ICG) may be used to make the identification, location and extent of the membrane easier to visualize, grasp and remove.

This duty includes the safe and careful execution of the surgery by stabilizing the operating room table, preventing movement of the patient[']s head and eye, and cautioning operating room personnel not to bump the table, the patient, the surgeon or the microscope, especially during portions of the procedure in which the surgeon is in close proximity to the retinal surface.

The surgeon's duty includes appropriate visualization of the internal structures of the eye through an operating room microscope and viewing system. While viewing the internal anatomy of the eye the surgeon has a duty to control and guide the instrument tips in a safe and effective manner, without poking or otherwise damaging the retina or other internal structures.

Thus, during the procedure the surgeon has a duty to control all the elements of the surgery to allow the safe removal of the vitreous and macular membrane in a non-traumatic manner.

Dr. Maggiano then explained his opinion as to how Dr. Diaz-Rohena breached the standards of care:

During the vitrectomy surgery of March 2nd, 2004, Dr. Diaz lost control of the instrument tips and/or the patient[']s head position and poked the retina in two areas close to the area of the macular hole. This occurred at some point during the period of time in which he held instruments in his hands with the instrument tips inside of the eye. Dr. Diaz breached his duty by not controlling all the elements of surgery as stated above. At one or more points during the vitrectomy surgery Dr. Diaz failed to do one or more of the following: he failed to correctly stabilize the surgical table or patient[']s head and body; he failed to properly instruct and/or sedate the patient sufficiently to prevent harmful movement of the patient[']s head or body; he failed to utilize an anesthesiologist to prevent harmful movement of the patient[']s head or body; he failed to correctly control the position and movement of the instrument tips; he failed to prevent operating room personnel from bumping his hands, arms, or body; he failed to prevent operating room personnel from bumping the patient[']s head or body. Any one of

4

these failures is sufficient enough to have caused damage to the retina via a poke or gouge to the retina.

Next, Dr. Maggiano described the nature of the injuries Melton sustained:

A review of the medical records and a review of the photographs of the retina of Ms. Melton's left eye show severe pathological changes that were not present prior to the vitrectomy surgery of March 2nd, 2004. There appear to be at least two adverse findings in the retina of her left eye. First, she sustained a new retinal hole (poke or gouge mark) that was not present prior to the surgery of March 2nd, 2004. This is located within a portion of the retina close to, but apart from the original macular hole. Second, she sustained a second poke mark causing a branch retinal artery occlusion (retinal stroke) close to, but apart from the original macular hole.

Each of these injuries alone is a major injury to the retina. Compared to her pre-operative status, each injury has caused an additional severe impairment of visual function. Both injuries have jointly caused loss of central visual acuity, and loss of visual field. Both injuries have jointly prevented the visual recovery expected to occur after this type of surgery, and have additionally decreased the vision in Ms. Melton's left eye to less than it would have been had the surgery not been performed. The injuries sustained do not appear to be treatable by any future medical or surgical interventions.

Finally, Dr. Maggiano explained the causal relationship between the breaches of the standard of care he imputes to Dr. Diaz-Rohena and the injuries he just described, as well as his prognosis for the visual acuity of Melton's left eye:

Dr. Diaz breached the standards of care by failing to control the surgical instrument tips inside of the vitreous cavity during the vitrectomy procedure. The instrument tips damaged the retina in at least two areas. This damage includes both a new retina hole, and an occlusion of one of the arterial branches of the retina. Dr.

5

Diaz'[s] failure to control the circumstances of the vitrectomy surgery and the moment-to-moment position of the instrument tips within the eye caused the instrument tips to damage (poke or gouge) the retina in at least two areas. The currently observed retina status, apart from the pre-operative status, is a result of the damage from the instrument tips. Thus, the breaches in the standards of care proximately caused the described injuries.

It is more likely than not, absent the breaches of the standards of care, that Ms. Melton would not have sustained damage to her vision and retina discovered after the vitrectomy surgery of March 2nd, 2004.

The instrument damage to the retina caused the eccentric macular hole and the branch arterial occlusion. These damages have not only prevented her from experiencing a visual recovery, but have caused additional visual loss compared to her pre-operative status.

It is my further opinion that this kind of injury to the eye is irreversible and will be permanent. In addition, it is my opinion that Ms. Melton may develop a macular hole in her right eye in the future, and that she may face the untenable decision of whether to risk another macular hole surgery.

Dr. Diaz-Rohena filed objections to Dr. Maggiano's report and moved the court to dismiss Melton's claims, arguing that Dr. Maggiano's report provided no factual basis for his conclusions that Dr. Diaz-Rohena poked the retina in two areas close to the macular hole, failed to prevent the movement of Melton's body or the jostling of the operating table and equipment during the procedure, and failed to control the movement of the surgical instrument tips

6

inside the vitreous cavity. The trial court overruled Dr. Diaz-Rohena's objections and denied his motion to dismiss. This appeal followed.

## Standard of Review

In part of his first issue, Dr. Diaz-Rohena argues that we should review the trial court's denial of his motion to dismiss under the de novo standard. We recently rejected the identical argument and held that the abuse of discretion standard applied in *Center for Neurological Disorders, P.A. v. George*, No. 02-06-00105-CV, 2008 WL 2717149, at *3 (Tex. App.—Fort Worth July 10, 2008, no pet. h.). We therefore overrule this part of Dr. Diaz-Rohena's first issue, and we will review the trial court's ruling for an abuse of discretion.

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id*. But a trial court has no discretion in determining what the law is or in applying the law to the facts, and thus "a clear failure by the trial court to analyze or apply the law correctly will

7

constitute an abuse of discretion." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992)*; Ehrlich v. Miles*, 144 S.W.3d 620, 624 (Tex. App.—Fort Worth 2004, pet. denied).

### Sufficiency of Report

In the remainder of his first issue and in his second issue, Dr. Diaz-Rohena argues that the trial court erred by denying his motion to dismiss because Melton's expert report contained legally insufficient information from which the trial court could conclude that Melton's claim has merit.

In a health care liability claim, a claimant must serve an expert report on each defendant no later than the 120th day after the claim is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (Vernon Supp. 2008). Under section 74.351(b), if an expert report has not been served on a defendant physician or health care provider within the 120-day period, then on the motion of the affected physician or health care provider, the trial court must dismiss the claim with prejudice. *Id.* § 74.351(b). The words "has not been served" include cases in which a report has been served but found deficient by the trial court. *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008). Subsection (b) is subject to subsection (c), which provides that when no report has been served because the report that was served was found to be inadequate, the trial court has discretion to grant one thirty-day extension to allow the claimant to

8

cure the deficiency. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *Leland v. Brandal*, 217 S.W.3d 60, 64–65 (Tex. App.—San Antonio 2006), *aff'd*, 257 S.W.3d 204 (Tex. 2008).

A defendant may challenge the adequacy of a report, and the trial court must grant the motion to dismiss if it finds, after a hearing, that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*). While the expert report "need not marshal all the plaintiff's proof," *American Transitional Care Centers of Texas, Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (construing former art. 4590i, § 13.01), it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6).

To constitute a good-faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875. A report does not fulfill this requirement if it merely states the

expert's conclusions or if it omits any of the statutory requirements. *Id.* at 879. The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* The claimant's expert must incorporate enough information to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude the claims are meritorious. *Id.*

When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Id.* at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See id*. However, section 74.351 does not prohibit *experts*, as opposed to courts, from making inferences based on medical history. *Marvin v. Fithian*, No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] Jul. 1, 2008, no pet. h.); *see also* TEX. R. EVID. 703 (providing that an expert may draw inferences from the facts or data in a particular case), 705 (providing that expert may testify in terms of opinions and inferences).

Dr. Diaz-Rohena argues that Dr. Maggiano's report is fatally defective because he improperly infers Dr. Diaz-Rohena's negligence from the injuries

themselves. Dr. Diaz-Rohena contends that because nothing in the operative record suggests that Dr. Diaz-Rohena poked or gouged Melton's retina with the surgical instruments, Dr. Maggiano's report merely speculates about the cause of her postoperative vision problems. He further argues that Dr. Maggiano's report fails to explain how the alleged pokes or gouges caused Melton's subsequent problems, noting that loss of vision is an inherent risk associated with retinal or vitreous surgery. *See* TEX. ADMIN. CODE ANN. § 601.2(f)(3) (Vernon 2008) (setting out inherent risks as defined by the Texas Medical Disclosure Panel).

Dr. Maggiano stated that a surgeon has a duty to control the elements involved in retinal surgery to allow the surgery to proceed safely and without causing damage to the retina, macula, or other eye structures. He stated that this duty includes taking steps to insure that the patient and operating equipment are immobilized during surgery, especially when the surgeon is working in close proximity to the retinal surface. Dr. Maggiano stated that his review of Melton's medical records and retinal photographs showed severe pathological changes to her left retina that were not present before the procedure performed by Dr. Diaz-Rohena, namely, two poke or gouge marks close to the original macular hole. Acknowledging that Dr. Diaz-Rohena reported in the operative record that he experienced no complications during the

11

surgery, Dr. Maggiano nevertheless opines that Dr. Diaz-Rohena failed to control the surgical instruments during the procedure and poked or gouged Melton's retina. He states that "[e]ach of these injuries alone is a major injury to the retina" and that "[c]ompared to her preoperative status, each injury caused an additional severe impairment of visual function. Both injuries have jointly caused loss of central visual acuity, and loss of visual field."

Thus, Dr. Maggiano's report summarizes his opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). We need not fill gaps in his report by drawing inferences or guessing as to what he likely meant or intended, *see Palacios*, 46 S.W.3d at 878, because his report contains what the statute requires.

The gist of Dr. Diaz-Rohena's argument is that Dr. Maggiano's report lacks a "smoking-gun" admission by Dr. Diaz-Rohena in the operative record that he gouged or poked Melton's retina during the procedure. But the rules of evidence allow an expert to draw inferences from the underlying facts or data, and that is what Dr. Maggiano has done here. *See* TEX. R. EVID. 703, 705. Moreover, Dr. Maggiano's report does not merely state his opinions and

12

inferences; he explains the basis for his conclusions and links them to the facts. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

Dr. Diaz-Rohena likens this case to *Jernigan v. Langley*, in which the supreme court criticized the court of appeals for indulging in "multiple inferences that are simply unsupported by the scant reports." 195 S.W.3d 91, 94 (Tex. 2006). This case is easily distinguishable. In *Jernigan*, one of the plaintiff's two expert reports did not mention Dr. Jernigan at all, and the other mentioned him only in passing in a single sentence. *Id.* at 93. By contrast, Dr. Maggiano's entire report focuses solely on Dr. Diaz-Rohena. Moreover, in *Jernigan*, it was the court of appeals that made (unsupported) inferences. *Id.* at 94. In this case, it is the expert, Dr. Maggiano—not the court—who draws inferences from the underlying medical records in light of the applicable standards of care, and his report explains the link between the records and his inferences.

Dr. Diaz-Rohena also suggests that Dr. Maggiano's report impermissibly relies on the evidentiary rule of res ipsa loquitur to support his inferences. Res ipsa loquitur is a doctrine that permits the fact-finder to infer negligence in the absence of direct proof. *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 865 (Tex. 1982). It is generally inapplicable to medical malpractice cases except those in which the nature of the alleged malpractice is plainly within the

13

common knowledge of laymen, making expert testimony unnecessary. *Shelton v. Sargent,* 144 S.W.3d 113, 120 (Tex. App.—Fort Worth 2004, pet. denied) (citing *Haddock v. Arnspiger*, 793 S.W.2d 948, 951 (Tex. 1990)). Thus res ipsa loquitur, which dispenses with the need for expert testimony, is not implicated in this case because Melton is relying on an expert—Dr. Maggiano—to establish the elements required by section 74.351.

We hold that Dr. Maggiano's report (1) informed Dr. Diaz-Rohena of the specific conduct that Melton has called into question and (2) provided a basis for the trial court to conclude the claims are meritorious. *See Palacios,* 46 S.W.3d at 879. We therefore hold that the trial court did not abuse its discretion by determining that the report complied with section 74.351, overruling Dr. Diaz-Rohena's objections to the report, and denying his motion to dismiss. We overrule both of Dr. Diaz-Rohena's issues.

### Conclusion

Having overruled both of Dr. Diaz-Rohena's issues, we affirm the trial court's order overruling his objections and denying his motion to dismiss.

ANNE GARDNER
JUSTICE

PANEL:     HOLMAN, GARDNER, and WALKER, JJ.

DELIVERED:  August 29, 2008

14